IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD T. FURNACE, ) | No. C 06-4609 MMC (PR) |
| ) | |
| Plaintiff, ) | |
| ) | **ORDER GRANTING** |
| v. ) | **DEFENDANTS' MOTION FOR** |
| ) | **SUMMARY JUDGMENT** |
| ) | |
| J.G. ARCEO, et al., ) | **(Docket Nos. 19 & 29)** |
| ) | |
| Defendants. ) | |
| _____ ) | |

On June 12, 2006, plaintiff, a California prisoner incarcerated at Salinas Valley State Prison ("SVSP") and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983. On January 5, 2007, the Court found plaintiff had stated cognizable claims in which he alleged the violation of his First and Fourteenth Amendment rights by prison officials for denying him religious meals and rejecting his request for a transfer to another prison that could provide him such meals. The Court ordered the complaint served on SVSP defendants Warden M.S. Evans, Correctional Food Manager R. Conway, Assistant Correctional Food Manager J. Pittman and Supervising Correctional Cook K. Soper; the Court also ordered the complaint served on J.G. Arceo, the Appeals Examiner/Facility Captain at the Inmate Appeals Branch of the California Department of Corrections and Rehabilitation ("CDCR") in Sacramento. Now before the Court is defendants' motion for

1 summary judgment. Plaintiff has filed an opposition to the motion,[1] and defendants have
2 filed a reply.

## FACTUAL BACKGROUND[2]

Plaintiff was received at SVSP on July 2, 2003, and has been housed at SVSP at all times relevant to the complaint. (Decl. D. Robert Duncan Supp. Defs.' Mot. Summ. J. ("Duncan Decl.") Ex. D.) Plaintiff has been a practitioner of the Shetaut Neter faith since 2003. (Duncan Decl. Supp. Defs.' Reply Ex. B ("Pl.'s Dep.") at 23:17-22.) Shetaut Neter, or Neterianism, is an African religion that originated in ancient Egypt in approximately 10,000 B.C.E. (Compl. Ex. A at 1.) The current worldwide head or spiritual leader of Shetaut Neter is Sebai Muata Ashby, Ph.D., ("Dr. Ashby"), of the Sema Institute. (Id. Ex. A at 2.) According to the Sema Institute, one of the main scriptures of the Shetaut Neter tradition is Prt M Hur or "Chapters of Enlightenment." (Id.) In this scripture are written specific practices for worship and meditation. (Id.) The Prt M Hur and other scriptures of the Shetaut Neter mandate a "Kemetic diet" for all Shetaut Neter practitioners. (Decl. Sebai Muata Ashby Supp. Defs. Mot. Summ. J. ("Ashby Decl.") ¶ 6.) The Kemetic diet consists of three types of food: food for the soul, food for the mind, and food for the physical body. (Id. ¶ 5.) The recommended diet for the physical body is a "vegetarian/vegan diet" that prohibits the consumption of meat, dairy, eggs, wheat, refined sugar and table salt. (Id. ¶ 4.)[3] The diet is primarily composed of whole foods, raw vegetables and fruits. (Id.) The optimal Kemetic diet is a raw food diet that consists of at least eighty percent organic raw vegetables and fruits. (Compl. Ex. A at 3.)

While Shetaut Neter mandates the Kemetic diet for all of its practitioners, individuals

---

[1] Prior to the date his opposition was due, plaintiff filed a request for an extension of time of thirty days in which to file his opposition. The request is hereby DENIED as moot; plaintiff timely filed his opposition in accordance with the original briefing schedule set forth in the order of service. (Docket No. 29.)

[2] Unless otherwise noted, the facts set forth in the following section are undisputed.

[3] Unless otherwise noted, all references hereafter to the "Kemetic diet" are to food for the physical body.

2

who have not yet achieved the optimal level of spiritual practice with respect to their diet are not excluded from practicing Shetaut Neter; these individuals are allowed to gradually transition in adopting the complete Shetaut Neter dietary practices. (Ashby Decl. ¶ 6.) In his book titled "Kemetic Diet: Food for Body, Mind and Soul" Dr. Ashby writes that the transition from a meat-eating diet to a "healthy vegetarian diet" should begin with meat substitutes; a full transition to the point where even the meat substitute can be reduced to a minimal level may require months or years. (Opp. Ex. D at 183.) Dr. Ashby further recognizes that Shetaut Neter practitioners may find themselves in situations where alternatives to dairy, wheat, refined sugar and table salt are not readily available. (Ashby Decl. ¶ 9.) Specifically, Shetaut Neter recognizes that in some instances strict adherence to the Kemetic diet may not be possible for inmates in institutions, as the institution may not be set up to meet some of the "non-traditional" dietary requirements, and, consequently, that an inmate practitioner "may need to make interim adjustments, under the guidance of a licensed dietician and health care practitioner, preferabl[y] knowledgeable about the vegan diet, to maintain the optimum physical health that is possible in the particular circumstances." (Id. ¶ 10.) Such adjustments should be viewed as a temporary departure from the prescribed diet, however, and the practitioner should always strive to improve his circumstances so as to be able to practice Shetaut Neter optimally. (Id.)

SVSP provides inmates with meals that are based on standardized menus generated by the CDCR's food-services section and approved by a registered dietician. (Decl. R. Conway Supp. Mot. Summ. J. ("Conway Decl.) ¶ 3; Decl. K. Soper Supp. Mot. Summ. J. ("Soper Decl.") ¶ 3; Decl. J. Pittman Supp. Mot. Summ. J. ("Pittman Decl.") ¶ 3.) The weekly menus created by CDCR's food-services section are used as a guideline by correctional food managers at all state institutions, including SVSP. (Conway Decl. ¶ 4; Soper Decl. ¶ 4; Pittman Decl. ¶ 4.) The meals provided by the correctional cooks and correctional food administrators at SVSP follow the menus and portions set forth in the CDCR standardized menus. (Conway Decl. ¶ 5; Soper Decl. ¶ 5; Pittman Decl. ¶ 5.) The standardized menus provided at SVSP meet the basic nutritional needs of average adult

3

males, ages 18-50; the caloric content of meals are averaged per week to ensure an average intake of 2800-3200 calories per day. (Conway Decl. ¶¶ 6-7; Soper Decl. ¶¶ 6-7; Pittman Decl. ¶¶ 6-7.)

The alternative-entree program at SVSP follows the standardized menu guidelines. (Conway Decl. ¶ 9; Soper Decl. ¶ 9; Pittman Decl. ¶ 9.) Under the alternative entree program, an inmate who for religious reasons chooses not to eat meat will be provided with a meat substitute. (Id.) Alternative entree items, i.e., meat substitutes, are indicated on the standardized menus provided to SVSP; an inmate who chooses not to eat meat will be provided with meals allowing him to meet the basic nutritional needs of an average adult male between the ages of 18 and 50. (Id.)

California Code of Regulations title 15, § 3054 sets out the regulatory guidelines concerning prisoners' special religious dietary needs. Under § 3054(a), "[e]ach facility shall make reasonable efforts, as required by law, to accommodate those inmates who have been verified to require special religious diets." (See Compl. Ex. 2.) The facility chaplain must verify an inmate's special religious dietary needs by contacting the religious organization of which the inmate claims to be an observant member, and must provide the facility food manager with the inmate's name and special religious dietary needs. (Id.) If an inmate's special religious dietary needs prohibit him from consuming an item or items from the daily scheduled meal, the inmate "may be accommodated by being provided another item(s) from that same days' scheduled meal that is consistent with their dietary need." (Id.) Under § 3054(b), inmates with special religious dietary needs "may be transferred to another facility that is equipped to accommodate them." (Id.)

On June 6, 2005, D. Moon ("Moon"), the Facility D Chaplain at SVSP, wrote an institutional "chrono" providing as follows:

> Inmate Furnace is verified to receive a Special Religious Diet per California Code of Regulations title 15, § 3054. "No Meat" Includes Breakfast, Lunch and Dinner. (Daily).

(Duncan Decl. Ex. B.)

On July 28, 2005, plaintiff filed an inmate appeal at the informal level of review,

4

complaining that defendants Correctional Food Manager R. Conway ("CFM Conway"), Assistant Correctional Food Manager J. Pittman ("ACFM Pittman") and Supervising Correctional Cook K. Soper ("SCC Soper") were responsible for providing him with a "nutritionally balanced religiously based vegetarian diet three times daily," but had failed to fulfill their obligation to do so. (Compl. Ex. 1 at 2.) Specifically, plaintiff complained that the meals he was receiving contained foods that he was prohibited from consuming because of his religion; he also complained he was not being provided citrus or protein substitutes with his daily meals, and was instead given foods that he could not consume, such as dairy products, jello and pudding. (Id.) Plaintiff asked to be transferred to another prison under § 3054, on the ground SVSP was unwilling to provide him with a nutritionally balanced religious diet. (Id.) The informal level reviewer responded to plaintiff's appeal by telling him that the officers in each building distributed special meals to inmates based on a list distributed from the Central Kitchen (Id.)

On September 18, 2005, plaintiff filed his appeal at the first formal level of review. (Id.) On September 28, 2005, the appeal was denied by CFM Conway and SCC Soper, who told plaintiff the CDCR "does not recognize vegetarian diets, only religious diets," and plaintiff had the option of eating alternate entrees from the CDCR-approved menu. (Compl. Ex. 1 at 5.)

On November 29, 2005, plaintiff filed his appeal at the second formal level of review, complaining that he was dissatisfied with the first level response because the first level reviewer had failed to recognize the nature of his complaint, specifically, that the institution was not equipped to facilitate his religious dietary needs. (Compl. Ex. 1 at 3.) On December 22, 2005, following an investigation by ACFM Pittman, the appeal was denied at the second level of review. The following explanation was provided for the denial: (1) SVSP is mandated to follow the menu approved by the CDCR, including alternate entrees; (2) the religious diet offered at SVSP was an alternate entree diet approved by the Muslim chaplain; (3) plaintiff was receiving the religious diet approved by the Muslim chaplain, and (4) the religious diet requested by plaintiff is not offered at SVSP. (Compl. Ex. 1 at 6-7.)

On February 4, 2006, plaintiff filed his appeal at the Director's level of review, stating his sole request was that he be transferred to another prison. (Compl. Ex. 1 at 3.) On May 4, 2006, N. Grannis, Chief of the Inmate Appeals Branch, denied plaintiff's appeal, finding as follows:

> The appellant has not established that the SVSP has failed to make a reasonable effort as required by law, to accommodate those inmates with special religious dietary needs. The institution is serving a meal menu that has been approved by the Department's dietician. The appellant's taste preferences notwithstanding, the meals served are nutritionally balanced, wholesome and healthy. The diet meets government-approved guidelines for adult males. Based upon the documentation presented no modification to the decision reached by the institution is required.

(Compl. Ex. 1 at 1.)

On June 12, 2006, plaintiff filed his complaint in the instant action. He claims he is being denied his First Amendment right to the free exercise of his religion because the SVSP alternative religious diet does not meet the requirements of a Kemetic raw food diet, and he is required to eat food forbidden by his faith in order to meet his nutritional needs. Plaintiff also claims the refusal of SVSP prison officials to provide him with a Kemetic diet or to transfer him to another institution where he could be provided with such a diet violates his rights under the Equal Protection Clause of the Fourteenth Amendment.

**DISCUSSION**

A.  Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof

6

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" See Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if, as to any given fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

B. <u>Analysis</u>

    1. <u>Free Exercise Claim</u>

The First Amendment guarantees the right to the free exercise of religion. Cruz v. Beto, 405 U.S. 319, 323 (1972) (per curiam). Under the Free Exercise Clause, inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir. 1987). "The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." O'Lone v. Shabazz, 482 U.S. 342, 348 (1987). Even if a prison regulation impinges on an

inmate's exercise of his religion, however, no First Amendment violation will be found if the regulation is reasonably related to legitimate penological goals. Id. at 349 (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

### a. Conduct Mandated by Plaintiff's Faith

In order to establish a free exercise violation, a prisoner must show the defendant burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith. See Freeman v. Arpaio, 125 F.3d 732, 736 (9th Cir. 1997). Such a showing requires a threshold determination that the plaintiff's claim is rooted in a sincerely held religious belief. See Shakur v. Schriro, No. 05-16705, slip op. 1011, 2008 WL 185496, at *3 (9th Cir. Jan. 23, 2008) (citing Malik v. Brown, 16 F.3d 330, (9th Cir. 1994); Malik, 16 F. 3d at 333 (holding, to implicate Free Exercise Clause, plaintiff's belief must be both "sincerely held" and "rooted in religious belief").

At the outset, defendants argue, plaintiff has not produced evidence showing they have burdened the practice of conduct mandated by his faith, because he has not shown practitioners of Shetaut Neter are required to eat a raw food diet in every situation. Plaintiff claims he has established a free exercise violation based on his sincerely held beliefs as to the dietary requirements of the Shetaut Neter religion. For the reasons stated below, the Court concludes plaintiff has not produced evidence that creates a genuine issue of material fact as to whether his sincerely held religious beliefs include the belief that practitioners of Shetaut Neter are required to eat a raw food diet in every situation.

Plaintiff alleges he sincerely holds the beliefs of the Shetaut Neter religion, one of which is that the practitioners of Shetaut Neter follow a vegetarian diet. (Compl. ¶¶ 3-6.) According to plaintiff, the vegetarian diet adhered to by the practitioners of Shetaut Neter forbids the consumption of meat, dairy, eggs, wheat, refined sugar, table salt, or genetically modified or irradiated foods, and further requires the consumption of at least eighty percent organic raw fruits and vegetables. (Compl. ¶¶ 5-6 & Ex. A at 3.) As support for his claim that such a diet is required of Shetaut Neter practitioners, plaintiff relies upon the writings of Dr. Ashby concerning the Kemetic dietary requirements. (Compl. Ex. A; Opp. Exs. C, D &

8

1 G; Pl.'s Dep. 42:11-16), and states that were he not incarcerated, he would choose to eat the
2 raw food diet described by Dr. Ashby in his book. (Pl.'s Dep. at 44:2-15.) The raw food diet
3 described by Dr. Ashby consists of raw, fresh, uncooked foods, e.g., vegetables, fruits, nuts
4 and seeds, vegetable and fruit juices; foods that are sun-cooked, e.g., raw bread; or foods that
5 are dehydrated at a low temperature. (Compl. ¶ 6; Opp. Ex. G at 1; Pl.'s Dep. at 44:7-15.)

6 While defendants do not question the sincerity of plaintiff's beliefs as a follower of
7 the Shetaut Neter religion, they argue plaintiff has not established a free exercise violation
8 because he has not produced evidence that contradicts Dr. Ashby's declaration that Shetaut
9 Neter practitioners are not always required to eat a raw food diet. Specifically, they point to
10 Dr. Ashby's statement that Shetaut Neter recognizes that strict adherence to the Kemetic diet
11 may not always be possible for inmates; consequently, under such circumstances, some
12 divergence from the optimal practices of Shetaut Neter is allowed, and practitioners may
13 transition over time to the raw food diet. (Ashby Decl. ¶ 10.)

14 Plaintiff concedes that, according to Dr. Ashby, inmate practitioners of Shetaut Neter
15 are not required to adhere strictly to the raw food diet if they cannot do so due to institutional
16 limitations; moreover, he does not dispute Dr. Ashby's interpretation of this aspect of the
17 Shetaut Neter religion. (Opp. ¶ 23.) He emphasizes, however, that Dr. Ashby views such
18 instances of diet modification as a departure from the prescribed Kemetic diet. (Id.)

19 Based on the foregoing, and viewing the evidence in the light most favorable to
20 plaintiff, the Court finds plaintiff is a sincere believer in the Shetaut Neter faith, including the
21 dietary requirements of the faith, but that plaintiff has neither alleged nor produced evidence
22 demonstrating that the consumption of anything other than the optimal raw food diet is
23 mandated by his faith in every situation. Plaintiff's sincere beliefs concerning the dietary
24 requirements of his faith are founded on the teachings of Dr. Ashby concerning the Kemetic
25 diet; such teachings include not only Dr. Ashby's belief that a raw food diet is optimal, but
26 also his recognition that Shetaut Neter practitioners may need to transition to such a diet over
27 time – especially where prisoners are concerned and the transition to a raw food diet might
28

not be possible due to institutional limitations. Moreover, while plaintiff contends defendants' failure to provide him with a raw food diet forces him to defile himself by consuming foods that are forbidden by his religion, in neither Dr. Ashby's declaration nor his writings is there a statement to the effect that anything other than a raw food diet is forbidden by Shetaut Neter. Indeed, in the sections of Dr. Ashby's book that plaintiff has attached to his opposition, Dr. Ashby advises practitioners to transition to the Kemetic diet, but makes clear such transition can take months or even years. (Opp. Ex. D at 1.)

In sum, plaintiff's belief that he must eat a raw food diet is based on the religious teachings of Dr. Ashby, which teachings recognize that eating a raw food diet is not always feasible for Shetaut Neter practitioners, especially in the prison setting. Notably, plaintiff does not claim he sincerely believes only certain aspects of Dr. Ashby's teachings; rather, he claims Dr. Ashby is the author of the Kemetic diet and the "bottom line" concerning the dietary requirements of Shetaut Neter. (Pl.'s Dep. 42:13-16.) Consequently, plaintiff's sincere belief in the dietary aspirations set forth by Dr. Ashby for Shetaut Neter practitioners necessarily includes those aspects of Dr. Ashby's teachings that recognize that the practitioners of Shetaut Neter in general, and those who are prisoners in particular, are not required to eat a raw food diet in all situations, especially when institutional regulations prevent them from so doing.

Accordingly, as plaintiff has failed to produce evidence that creates a genuine issue of material fact as to whether defendants' refusal to provide plaintiff with a raw food diet burdens conduct that is mandated by plaintiff's faith, the Court finds plaintiff's claim does not establish a violation of the Free Exercise Clause.

b. Legitimate Penological Objectives

Even if there were evidence to support plaintiff's claim that defendants have burdened conduct that is mandated by plaintiff's faith, no violation of plaintiff's First Amendment rights can be made out if the restriction imposed by defendants was reasonably related to legitimate penological objectives. O'Lone, 482 U.S. at 349 (quoting Turner v. Safley, 482

U.S. 78, 89 (1987)). In Turner, the Supreme Court identified four factors to consider when determining whether a regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." Turner, 482 U.S. at 89-90.

The task in considering the Turner factors is not to balance the four factors, but, rather, to determine whether the state shows a reasonable relation between the policy and legitimate penological objectives, rather than simply a logical one. Beard v. Banks, 126 S. Ct. 2572, 2580 (2006). While all justifiable inferences must be drawn in the prisoner's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities. See id. at 2578. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. Id.

With respect to the first Turner factor, the initial burden is on defendants to put forth a "common-sense" connection between their policy and a legitimate penological interest. See Frost v. Symington, 197 F.3d 348, 357 (9th Cir.1999). If defendants do so, plaintiff must present evidence that refutes the connection. Id. Defendants must then present enough counter-evidence to show that the connection is not "so remote as to render the policy arbitrary or irrational." Id.

Defendants argue that two legitimate penological interests prevent them from providing plaintiff with a raw food diet: budgetary and administrative concerns. In support of their argument, defendants have presented declarations attesting to the fact that all meals

11

provided to inmates at SVSP are based on standardized menus generated by the CDCR's food-services section and approved by a registered dietician; this plan includes the SVSP alternative-entree meals that are provided to inmates who for religious reasons choose not to eat meat. (Conway Decl. ¶¶ 3, 9; Soper Decl. ¶¶ 3, 9; Pittman Decl. ¶¶ 3, 9.) The available alternative-entree items, i.e., meat substitutes, are indicated on the menus provided to SVSP by the CDCR. (Conway Decl. ¶ 9; Soper Decl. ¶ 9; Pittman Decl. ¶ 9.)

Even where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns. See Shakur, 2008 WL 185496, at *4. Here, it is undisputed that plaintiff's raw food diet cannot be prepared from either the standardized SVSP regular menu or the alternative-entree menu; consequently, the Court finds a common-sense connection exists between defendants' policy of not providing plaintiff with a raw food diet and their legitimate budgetary and administrative concerns. See id. (holding prison could rationally conclude that denying requested religious diet would simplify its food service and reduce expenditures); see also Ward v. Walsh, 1 F.3d 873, 877 (9th Cir. 1992) (holding prison has legitimate interest in running simplified food service, rather than one giving rise to many administrative difficulties). Accordingly, as plaintiff has not presented evidence that refutes the connection, defendants have satisfied the first element of the Turner test. See Frost, 197 F.3d at 357.

The second Turner factor is "whether there are alternative means of exercising the right that remain open to prison inmates." Turner, 482 U.S. at 89-90. In the context of free exercise claims, the relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that he claims is being affected; rather, the question is whether the inmate has been denied all means of religious expression. Ward, 1 F.3d at 877. Thus, the second Turner factor has been deemed satisfied where the prisoner retains "the ability to participate in other significant rituals and ceremonies" of his faith, even if some aspects of religious practice are impinged upon. Id.

Defendants assert that alternative means of plaintiff's expressing his religion remain open to him; in support of their argument they provide evidence of the following: (1) plaintiff receives vegetarian meals that allow him to avoid meat and meet his basic nutritional needs; (2) he is allowed to meditate, pray and study the Shetaut Neter scriptures for a half hour to a full hour three times each day, in the morning, noon and evening; (3) he is allowed to practice the yoga positions that are recommended by Shetaut Neter; (4) he participates in monthly fasts, at which times he limits his food intake to fruits and water and recites the Shetaut Neter scriptures; and (5) he is permitted to wear an ankh amulet as a symbol of his faith. (Mot. Summ. J. ¶¶ 23-28; Pl.'s Dep. 27:18-25; 28:4-10; 30:9-23; 32:4-7.) Plaintiff does not produce any evidence in opposition to that produced by defendants, nor does he claim that he is being denied alternative means of expressing his religion. Accordingly, the Court finds defendants have satisfied the second element of the Turner test.

The third Turner factor requires the Court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." Turner, 482 U.S. at 91. Defendants assert that providing plaintiff with a raw food diet will significantly impact both prison resources and prison officials, and that institutional budgetary concerns weigh strongly in favor of providing plaintiff with a religious vegetarian diet. In support of their assertions, defendants have provided declarations showing that meal preparation at SVSP is a systematized process that involves many different departments and individuals. At the administrative level, SVSP correctional food managers must prepare menus that comply with the CDCR's weekly standardized food menus, and they must accomplish this task while also managing the food budget and purchasing food from approved vendors. (Conway Decl. ¶¶ 2, 4, 9; Pittman Decl. ¶¶ 2, 4, 9.) At the practical level, kitchen staff must prepare all inmate meals in accordance with the correctional food managers' menus; inmates working in the kitchen must serve the meals or place them on delivery carts; and correctional officers must deliver the meals to the inmates who eat in their cells (a group constituting approximately half of the inmates at

SVSP), including those inmates who have a "religious diet" card on their cell and must receive an alternative-entree meal. (Conway Decl. ¶¶ 8, 10; Pittman Decl. ¶¶ 8, 10.)

Based on defendants' evidence, which plaintiff does not dispute, the Court finds that if defendants were required to accommodate plaintiff's religious dietary needs by preparing and serving him an individualized raw food diet three times daily, such accommodation would have a burdensome impact on SVSP administrative and budgetary resources. See DeHart v. Horn, 390 F.3d 262, 271-72 (3d Cir. 2004) (finding accommodation of plaintiff's religious dietary needs would have burdensome impact on prison where requested vegan diet would require specialized ordering and preparation of food and individualized preparation of meals in kitchen designed for bulk food preparation). Accordingly, defendants have satisfied the third element of the Turner test.

The fourth Turner factor requires the Court to consider whether there is an absence of ready alternatives to the prison regulation; a ready alternative is one that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." Turner, 482 U.S. at 91. The burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation. See O'Lone, 482 U.S. at 350 (1987); see also Mauro v. Arpaio, 188 F.3d 1054, 1063 (9th Cir. 1999) (finding in favor of defendants on fourth Turner factor where plaintiff failed to point to alternative that accommodated his rights at *de minimis* cost to security interests). Here, plaintiff has not put forth a ready alternative to defendants' religious-diet policy that would accommodate his right to a religious diet at a *de minimis* cost to defendants' legitimate administrative and budgetary concerns. Accordingly, the Court finds defendants have satisfied the fourth element of the Turner test.

In sum, for the reasons discussed above, the Court concludes plaintiff has not created a genuine issue of material fact with respect to his claim that defendants have violated his First Amendment right to the free exercise of his religion by denying him a raw food diet. Specifically, plaintiff has not produced evidence showing that defendants have substantially

14

burdened conduct that is mandated by his religion. Moreover, defendants have shown that the refusal to provide plaintiff with a raw food diet is reasonably related to legitimate penological objectives. Accordingly, defendants are entitled to summary judgment on plaintiff's First Amendment Free Exercise claim.[4]

### 2. Fourteenth Amendment Claim

Plaintiff claims that his right to equal protection under the Fourteenth Amendment was violated by defendants' refusal to transfer him to a prison where he could receive a raw food diet. The Fourteenth Amendment's equal protection guarantee ensures that prison officials not discriminate against particular religions. See Cruz v. Beto, 405 U.S. 319, 321-22 (1972) (per curiam). Prisons must afford an inmate of a minority religion "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." Id. at 322. Prisons need not provide identical facilities or personnel to different faiths, but must make good faith accommodation of the prisoners' rights in light of practical considerations. See Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997).

To succeed on an equal protection claim, a plaintiff in a § 1983 action must show that officials intentionally acted in a discriminatory manner. See id. Consequently, to defeat summary judgment, plaintiff must set forth specific facts showing there is a genuine issue as to whether defendants denied him a reasonable opportunity to pursue his faith as compared to prisoners of other faiths, and that such conduct was intentional. See id.

In his complaint, plaintiff claims his right to equal protection was violated because the refusal to transfer him was in direct violation of prison regulations and was not related to legitimate penological concerns. (Compl. ¶¶ 17-18.) Defendants argue plaintiff has not established an equal protection violation because he has produced no evidence showing defendants intentionally discriminated against him; specifically, he has not produced any

---

[4]In light of this finding, the Court does not reach defendants' argument that they are entitled to qualified immunity on plaintiff's Free Exercise claim.

15

evidence that another prison facility could better accommodate his request for a raw food diet and that defendants intentionally denied his request to be transferred to such facility. Further, defendants argue, the evidence shows plaintiff was provided with a reasonable opportunity to practice his faith, by being served a diet that allowed him to avoid meat, and also being allowed to exercise his religion in several alternative ways, including prayer, yoga, mediation, and recitation of scriptures. In his opposition, plaintiff claims, for the first time, that practitioners of Shetaut Neter are denied equal protection of the law because Muslim and Jewish inmates at SVSP are provided foods that satisfy their religious dietary laws. (Opp. 18:8-11.) Defendants reply that plaintiff has produced no evidence to support his conclusory assertion that Muslim and Jewish inmates are receiving dietary accommodations that more fully satisfy their religious dietary requirements

The Court finds plaintiff has not produced evidence showing there is a genuine issue as to whether defendants have violated plaintiff's right to equal protection, either by refusing to transfer him to another prison or by providing Muslim and Jewish prisoners with foods that satisfy their religious dietary needs. Nor has plaintiff produced evidence showing defendants have denied him a reasonable opportunity to practice his faith as compared to other prisoners, and that such conduct was intentional. Accordingly, defendants are entitled to summary judgment on plaintiff's equal protection claim.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is hereby GRANTED and judgment shall be entered in favor of all defendants.

This order terminates Docket Nos. 19 and 29.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: March 3, 2008

_____
MAXINE M. CHESNEY
United States District Judge